UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 13 CR 268 (JMF)

EDWIN TING,

Defendant.

------------------------------x

New York, N.Y.
January 21, 2014
2:55 p.m.

Before:

HON. JESSE M. FURMAN,

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
JOSHUA NAFTALIS
Assistant United States Attorney

ERIC P. FRANZ
ANDREW MANCILLA
Attorneys for Defendant

ALSO PRESENT:

ROBERT HANRATTY - FBI AGENT

(Case called)t

THE COURT: You may be seated.

MR. NAFTALIS: Good afternoon, your Honor, John Naftalis, for the government. With me at counsel table is Robert Hanratty from the FBI.

THE COURT: Good afternoon.

MR. FRANZ: Eric Franz, for Mr. Ting. Sitting next to me is Andrew Mancilla.

THE COURT: Good afternoon to all of you.

I imagine most of you know that the courthouse was closed or is closed or will be close effective 3:00 o'clock today. Although we will proceed and finish after 3:00 o'clock, I did make the decision that we should go forward with this since it had been adjourned a couple times already. I imagine that people might have flown in this and have made their way down to the courthouse already. We are here. I don't see any problem with proceeding, and we will do so.

I thank everybody for being here, notwithstanding the weather outside and hope everybody gets hope safely. We are here for purposes of sentencing. In preparation for today's proceeding, I have reviewed the presentence report dated December 26, 2013. I have also received and reviewed the following additional submissions: The defendant's submission filed on December 24, 2013, as well as the attachments to that submission which include letters addressed to me from the

defendant, from various relatives, including his wife and in-laws and the like from various friends and acquaintances, and other items as well. I have also received and reviewed the government's submission filed on December 26, 2013.

Are there additional submissions I should have received?

MR. NAFTALIS: Not from the government, your Honor.

MR. FRANZ: No.

THE COURT: There are some redactions in the submissions I just mentioned. As far as I can tell, it's basically limited to addresses and the names of nonparties or minors. As far as I'm concerned there is no reason to even file the unredacted versions of the submissions under seal because the matters that were redacted are either in compliance with the federal rules or otherwise not relevant to sentencing, but I want to make sure that everybody else agrees with that.

MR. FRANZ: I agree, your Honor.

MR. NAFTALIS: That's fine, your Honor.

THE COURT: Mr. Franz, have you read the presentence report?

MR. FRANZ: I have, your Honor, and I reviewed it with Mr. Ting. We filed our appropriate objections and the probation department has incorporated those objections into the amended presentence report. I don't think there is anything outstanding for the Court to determine.

THE COURT: Mr. Ting, have you read the presentence report?

THE DEFENDANT: I have, your Honor.

THE COURT: Have you reviewed it and discussed it with Mr. Franz?

THE DEFENDANT: I have, your Honor.

THE COURT: Have you had the time to go over with Mr. Franz any mistakes in the report, or anything else that you would want to bring to my attention in connection with the sentencing?

THE DEFENDANT: I have reviewed it and I don't want to bring anything up.

THE COURT: Have you had enough time to discuss it with Mr. Franz?

THE DEFENDANT: Yes, your Honor.

THE COURT: Mr. Naftalis, have you reviewed the presentence report?

MR. NAFTALIS: Yes, your Honor. We don't have any decisions or corrections.

THE COURT: Since both counsel have already indicated that they have no objections to the report with respect to its factual accuracy, I will adopt the factual recitations set forth in the report. The presentence report will be made a part of the record in this matter and placed under seal. If an appeal is taken, counsel on appeal may have access to the

sealed report without further application to me.

As counsel is aware, I'm no longer required to follow the United States Sentencing Guidelines. That is to say, they are not binding on me, but I am required to consider them in determining and imposing an appropriate sentence and, therefore, must begin by accurately calculating the Sentencing Guidelines range. In this case, there was a plea agreement in which the parties stipulated to a particular calculation of the Sentencing Guidelines.

Mr. Franz, am I correct that the calculation in the presentence report is in accord with the calculation set forth in the plea agreement?

MR. FRANZ: Yes, your Honor.

THE COURT: Mr. Naftalis, you agree?

MR. NAFTALIS: Yes, your Honor.

THE COURT: I take it counsel agrees it is unchanged by virtue of the more recent version of the guidelines, the 2013 guidelines?

MR. NAFTALIS: Yes, your Honor.

MR. FRANZ: Yes, your Honor.

THE COURT: Based on the parties' agreement, absence of any objection and my independent evaluation of the Sentencing Guidelines, I accept the guidelines calculations set forth in the presentence report. Accordingly, using the November 2013 edition of the guidelines, I find the total

offense level is 12, the Criminal History Category is I, and the guidelines range is 10 to 16 months' imprisonment and the fine range is 3,000 to $30,000.

In the plea agreement, both parties agree not to seek a departure from the guideline sentence; that is, a departure within the guidelines framework. Is that correct, Mr. Franz?

MR. FRANZ: Yes, your Honor.

THE COURT: Mr. Naftalis.

MR. NAFTALIS: Yes, your Honor.

THE COURT: I have, nevertheless, considered whether there is an appropriate basis for a departure. That is, again, within the guidelines system. I do not find any grounds warranting a departure under the guidelines.

Having settled all of that, Mr. Naftalis, do you wish to be heard with respect to sentencing?

MR. NAFTALIS: Your Honor, briefly, our position is set forth in our December 26 letter. The government's position is, in comparison the defendants that have come before your Honor, Mr. Ting is the most culpable, just to put him in context. With respect to the other illegal poker defendants, I believe there are five or six, we again believe that he is the most culpable of that group.

The defendant made millions of dollars by running what we believe to biggest illegal poker game in New York City. This wasn't a friendly game of poker, as suggested in the

defendant's submission. This was a poker game held in hotels like The Plaza where tens, hundreds of thousands of dollars are wagered in a given hand. Mr. Ting made millions of dollars off of that as reflected in the forfeiture amount. We believe that a jail sentence in the ten-to-16-month guideline range is appropriate.

Finally, with respect to the illegal poker, we would note, as I think everybody concedes, this is Mr. Ting's second conviction for the same thing. We think that this recidivism speaks in favor of a jail sentence in this case. Finally, just to anticipate an argument that Mr. Franz will make, while the defendant did not plead guilty to money laundering, the conduct where Mr. Ting brought money, $500,000 from Las Vegas to New York City for Vadim Trincher in connection with his kids, we believe there is really no other explanation, other than the fact that it's moving money to secrete it. That is money laundering. While it is not an offense for which he has been convicted, he has not pled guilty. We do not believe a Fatico is necessary. We do believe that this conduct is consistent with money laundering and simply speaks to the volume of money going around in this illegal conduct.

THE COURT: Before you sit down, let me just ask you a question with respect to that prior conviction that you referenced and that you mention in your submission.

Do you know anything about that conviction beyond what

is in the presentence report? That is to say, the presentence report doesn't have a whole lot in the way of details. It says that he was operating a poker game, or managing. I would assume given New York law, that that means he was taking a so-called rake, but maybe I'm wrong.

Do you know anything about that?

MR. NAFTALIS: Your Honor, I don't know anything else about it other than I think the scale of the conduct has increased, meaning he has made more money during the conduct that's the subject of conviction here, but I don't know whether the theory was a rake or not. I think he was running the game, but that is just an assumption.

THE COURT: Thank you very much.

Mr. Franz, do you wish to be heard?

MR. FRANZ: Yes, your Honor. Your Honor, do you mind if I speak from the podium?

THE COURT: As long as you move the podium so you are looking at me, that's fine.

MR. FRANZ: Of course. I wouldn't put my back or side to you, Judge.

THE COURT: You made proceed.

MR. FRANZ: Thank you, your Honor.

First, I want to thank you for your adjournment of the last appearance. I want to apologize. I made an error in my letter where I referred to the inclement weather that day when

I said hurricane, it was a blizzard. This is a winter storm. I am learning all of the differences in the vernacular of the weather that follows Mr. Ting's sentencings. This will be the final day that we are here, I am sure, with regard to Mr. Ting.

First, I would like to address two of the things that Mr. Naftalis said. I will start most recent. One, with regard to the prior case, Mr. Ting was in a place that was housing poker games. People were playing poker. He was there and the police came and raided it. He was arrested because he was working there. It wasn't his game. He was just a worker. He never defended the case because what happened was, as is all too familiar in state cases, he got processed after his arrest. He was in custody for about 24 hours, he came through to arraignments where a public defender was assigned to him and they told him he could have a plea of time served if he admits that he was there and running, working as a manager, and he did. He accepted his responsibility and he literally was let go. That was the end of it. It wasn't more to it. This wasn't an operation that was his. He was working in a place where people were playing cards, and that was wrong.

With regard to the issue of the movement of money, I want to put some context to that, Judge. My client was requested by Vidam Trincher, if one time when he is coming back from Vegas if he could some of Mr. Trincher's money back for him. My client didn't know Mr. Trincher very well. They

weren't great friends. He was friends with his sons and met Vidam through the sons. It was a favor. In the conversations referenced by the government in his letter of reference, in fact that Mr. Ting refers to it as a favor. This was isolated. I spoke to the government. There is no other acts of this. All he did was agree to move some money back when he was coming back from Vegas. Mr. Ting had no idea and still to this day, he has no idea whether or not that money was gambling money from legal gambling in Vegas, money that Mr. Trincher had in Vegas from other ventures that he is involved in. All my client knew was that Mr. Trincher was an extremely wealthy individual who, to my client's understanding, was worth hundreds of millions of dollars.

In this world, this poker world as the government agrees, the people that played in these games -- I don't accept that it wasn't a friendly game. These were people that became friends, and then others came into play. Mr. Ting didn't recruit players to play. What happened was, and it's described, I think pretty well in I think the letter of Steve Saraf that you got, was that originally these guys got together, they played poker. There was no rake. Other guys would come in and play, and that's the way it developed. These were guys that were friends. There were games in LA that Mr. Ting had played in, but wasn't running. There were games in New York that they asked Eddie, since you are not consumed

with working full time -- because he was professionally gambling at the time -- could you set up games for us, be the man who organizes it, and he did. For a while Mr. Ting had these games with his friends, and it was not illegal because there was no rake. That's the big difference. I'm sure that I'm speaking on firm ground here that if there is no rake, people playing cards isn't illegal. But then as friends saw that Eddie -- if I may refer to him as Eddie, because that's how I have come to know him? Is that okay?

THE COURT: Sure.

MR. FRANZ: Thank you.

That if you played in the game, then Eddie felt obligated to make sure that the people that won got paid and the people that lost got pay. One thing that stands out, whether there was a rake on some of the games or not a rake on other games -- because there wasn't on every game -- in fact, what Vidam Trincher's initial request was is there going to be a rake at the game, because there wasn't always a rake.

But one thing the government cannot dispute, Judge, Mr. Ting never, never engaged in any acts of violence whatsoever. He didn't enlist people to collect from people that defaulted on their payments. He paid the debts. While the government says he made millions, Mr. Ting did make money in profit from gambling, but the truth is that the rake was mostly absorbed by paying off debts and expenses. He made

money because he played in the games. This wasn't games where he wasn't there. He set them up. He organized them by people calling him and asking if they could play or asking who is playing. I recognize the government putting in the submission that he would seek out whales. This is a man who doesn't seek to exploit other people. His feeling was if the people had the money, and they could pay their debts, and they wanted to play and they knew what they were getting into, that was fine. Even in the conversation where they are talking about this gentlemen, Chris, one of the conversations referenced in the letter the government submitted to you, he and Illya Trincher were talking about Chris wanting to stack the game a certain way. Eddie and Illya were talking about, that's not the way you to it. If guys can play and they are willing to pay, then they can play. He wasn't seeking out people to exploit them. That's not what happened. This was, when you say intimate, it implies two, three. It grew to maybe 15 to 20 players that would play when they were available. But seeking to exploit them or attract whales or do things like that, that was not what Eddie did.

Back to the movement of the money, Judge, he was asked to do a favor in December and in January when he was in Vegas, and he had just won a huge game in Vegas. He asked Illya, Does your dad still need that favor? He said yes. He brought back the money, and they gave him the money. That's it. He didn't

have any reason to believe then that the money he was bringing back was the proceeds of illegal activity. This was a world, Judge, where these people, as you have read, they're hedge fund managers, they are entrepreneurs, they are very successful businessmen. You are not talking about people who are using their salary from this week to cash a check and play in a game. These are incredibly wealthy individuals, and he just felt like if he said no to him, he looks like he is not a real friend because they throw around these numbers like they are nothing. It's a different world. I wanted to just address that.

That, Judge, leads me to another issue that I think would be important for you to understand. Mr. Ting has never denied that what he did was wrong as far as running his poker games. Right after I got involved in this case, within perhaps a week or maybe two weeks at most of his arrest, I had a meeting with Mr. Naftalis and other representatives of the U.S. Attorney's office, and I indicated to them that I had already gone over all of this with Mr. Ting, and he is ready, willing and able to accept responsibility for what he did wrong and plead guilty to gambling. But because the government needed time to run down their concerns about money laundering, we weren't the first to plead. But I dare say we were the first to express our willingness plead to the very plea agreement that we ultimately received. I wanted you to know that as well, because it shows that this isn't somebody who has

malingered or tried to suggest that he is not guilty of something that he did. He willing to take responsibility for what he did because one thing about Eddie Ting that I can stand here before you, and say from all accounts, from all of these people in this room that I have had contact with one way or the another over the course of this case, from others who couldn't make it, from speaking to people in Vegas, he has always been a man of this word. I think that's what is born out from these letters.

I think that when you look at Eddie Ting, if you want to know what kind of person he is, he has always been a man of his word. He engages in acts of benevolence, which I will be more detailed with in a couple of minutes. He helps people. But he doesn't lie to people. He doesn't steal from people. He doesn't thieve from people and he certainly never engaged in any untoward actions towards any of the various people that owed him money that didn't pay. It wasn't even necessarily a debt owed to Eddie. It was a debt that someone owed to some third party that Eddie paid to the third party so they would be whole, and Eddie suffered as a result. But he is not complaining about it. He recognized that's the word he gave, and that's what he did.

In one of the other conversations that the government referenced in the letter to you, somebody calls him up because somebody owed money and he said, I didn't guarantee that game.

He is not accountable for everybody's losses in every game they play in. But if Eddie guaranteed it, he was a man of his word. That's how the rake came about, Judge, because everybody started to see. The people that were playing at the time were saying, Why are you paying for this guy that didn't pay or that guy. He said, Because I said that I would. That's how the rake came about. It wasn't Eddie's desire to start turning this into a lucrative business and not be there and hire people to run the game and just collect his money. He played in the games, Judge. This was just the way to cover the expenses and the losses. Right or wrong, it was wrong, but I thought that you should have the context of it. This wasn't like he was down in Tampa vacationing while somebody else was running games, and he was collecting money. It wasn't like that. This was to just pay the expenses as they went. There were times it was profitable, there were time it wasn't.

That's what makes this illegal because otherwise, this is a class A misdemeanor in New York, as we have already discussed.

THE COURT: Do you know what the duration of the poker game that he ran was? At least according to the PSR, I think it was from 2010 to 2013 or at least 2013 to 2013.

MR. FRANZ: It's a fair statement, but here is the thing, just so you understand, he has been playing in poker games for years. We have to distinguish between a poker game

and an illegal poker game, because 2010 may have been when he had a rake at times, but it wasn't consistent. It was, at first, because he was getting beat by people and the idea came about. But not every game. If you look at the conversations between 2012, since you are asking, was, Is there going to be a rake on this one. If there was a rake in everything game, Illya wouldn't have had to ask Eddie, Is there going to be a rake? My dad wants to know if there is going to be a rake. There would be no need for that if the rake was always consistent. It wasn't. It was sporadic. But once is enough to make it illegal, and there was more than one game, certainly, where there is a rake. I'm not going to mislead the Court. I would say to the best of his recollection, it may have started in 2010, because there was no real benchmark for him, but it was sporadic as the years went on. Obviously, it's come to a screeching halt with this case, and he's done with it.

THE COURT: Okay.

MR. FRANZ: A couple of other just things I want to respond to before I make my principle presentation, Judge. That is, that the government's letter, the indictment, this case at first, referenced all of these connections to organized crime. Mr. Ting is not involved in organized crime. He is not a member of organized crime. He is not an associate of organized crime. He didn't kick up money to organized crime.

He didn't enlist organized crime to help him collect payments. At most, I think in reading what the government has said, they said that people affiliated with organized crime may have played in his games. Well, he doesn't know who that is because alleged members and associates of organized crime don't walk around with a card and say, hey, I'm in organized crime. The first he heard or learned that he had any tangential connections to alleged organized crime figures was when he was arrested. Yes, it may be that the government believes some people played in the games had connections to organized crime, but this is information that Mr. Ting is not and was not privy to. I just ask the Court to take that into consideration. This is not somebody who is working with, for, on behalf of, in conjunction with in any way with organized crime. He ran a friendly game amongst friends. One of the things that jumped out at me was the letter from Neehar Banerji, who explained that he was playing in Eddie's games and at one point -- because Eddie is a very personal individual -- he confided in Eddie that his grades were slipping at school. He didn't get the reaction that he expected from Eddie. He was just having banter and Eddie said what are you doing here? You should be focused on school. He banned him from playing. That person wrote now they have a master's in economics, and they otherwise were about to drop out of school. That's not the exploitive whale sucker-searching person that I think the government might

want you to believe Mr. Ting is. It's just not. That's somebody who actually cares about people. There were very wealthy individuals that played in these games, that won in these games, that lost in these games. But Mr. Ting never sought to exploit anything unfairly. He played cards and he played it fairly, which is why his game prospered. He guaranteed that people would get paid and not get ripped off, which is why it prospered. Yes, he had a very successful game, because he was a man of his word. I think to a certain extent that demonstrates his character and when determining what the true measure of punishment should be for him, I think that he fairs better -- I don't want to be presumptuous, I don't sit where you sit -- but that fairs better than the person who just didn't care, raked from everybody, took whatever he could, sent out enforcers, threatened people's lives to get their money. That's as far afield from Eddie Ting that you could possibly get.

I think that with regard to that, there was the letter -- I know that you read everything, I'm not going to read you every letter excerpt, but I want to remind you of certain things. Jonathan Greenbaum, he circles around it, but what he is describing in his letter is there was an individual that owed money to Eddie. He didn't owe money to just Eddie, he owed money to Mr. Greenbaum and a number of other people. As people talked about him owing money, he was lying to this

one to borrow from this one -- I'm sure you heard these stories before -- and gets everybody together and they can't believe how much money this individual owes all of them collectively, and we have to do something about it. Eddie Ting said no, Eddie Ting stood up for this debtor. Eddie Ting stood up for the person they were calling a deadbeat and Eddie Ting said there are other things going on in his life. He was down on his luck. He was a friend. He might have taken advantage, but leave it alone. He counseled forgiveness and they gave forgiveness. That's who Eddie Ting is. It's a shame that he ever chose to charge the rake. The rake came about as a result of the fact that Eddie was losing money by guaranteeing people's losses. Being a man of his word caused him to do something that was against the law and she shouldn't have done it and he acknowledges that. But the context of how it came about and the reason for it, I think, speaks volumes as to what kind of person he is. Incidentally, we are not claiming nor will we that running the poker game was not illegal, as the Court knows, a lot this case was held up by the DiChristina case because everybody was awaiting it outcome of the Second Circuit's decision in DiChristina. Judge Weinstein, in the Eastern District, declared it wasn't illegal and the Second Circuit declared it is. But interestingly enough, one of the lawyers for the DiChristina is here today. Mr. DiChristina got sentenced today by Judge Weinstein in the Eastern District.

This is a person who never accepted responsibility, obviously, he went to trial, lost, appealed, came back, was sentenced today to one year of unsupervised release. Now, of course, that's a different judge -- and I don't mean to say that because one judge sentences someone, that you have to follow, please, I don't want to be presumptuous in that regard either -- but I think that that says something. This man accepted responsibility. He was willing to accept responsibility within a week or 10 days. Mr. Naftalis would absolutely agree with that because I went and explained that. We had to wait our turn, and that's fine. But he accepted responsibility. Mr. DiChristina didn't.

He is facing 10 to 16 months, Judge. It's almost like a fine line between maybe staying home and may not. I'm asking you, I'm begging you and Mr. Ting will beg you today to consider fashioning a sentence that keeps him home.

By the way, with regard to the money, I could give you nine other reasons why I don't believe it ever amounted to anything illegal with any guilty intent by Mr. Ting. I think I have said enough. If you have questions on it -- obviously I don't want that to influence a sentence in a negative way for him because it wouldn't be appropriate.

Eddie Ting, I've come to observe for now almost a year. But I feel from the numerous conversations and meetings and interactions that I know him. The letters that you got

really speak volumes about him, but let me tell you some letters that are absent that you may wonder, because you have been doing this for a long time, and you have seen many different types of submissions, that what we don't have -- and there is a reason for it and it's because for all of Eddie's virtues. Everything everybody says about Eddie is he is always wanting to help. I don't think there could be credibly disputed. He is one of the most benevolent individuals there because -- it's just money. It's time. It's effort. It's traveling to Brooklyn to help somebody's parents, to help his own father, it's going to the hospital, it's going to the school and the medical doctors.

We will get to that in a moment in more detail, but when I spoke to him and I said, Eddie -- he was telling me a story about something that was going on in the kids' school, one of the kids because he has six children now that he is raising -- by the way, when I was talking to him that day he went to pull out notes from his pocket and out came a single sock, because that's the kind of person Eddie is. A sock, not Eddie's sock, it was from his four-year old that he raises. He is the consummate father at home for all of them. I asked him if he could get any letters from the school guidance counselor or the principal, teacher, to illustrate for the Court all of his interaction with the school. He said, Look, I don't want to ask that because then the teachers are going to start

talking, and I don't want them to look at the kids any differently. He said, I want the judge to know who I am, but I don't want to do it at any potential expense, we live in a small community and people will talk. The same thing with the doctors, they are treating my brother-in-law. They are helping my mother. They are all so nice, they don't have time to sit and write letters like that. He just doesn't want to inconvenience people. But I have to respect that, that's his wish. But by all accounts, if you read the presentence report, you read the letters, they give the same sentiments that those other letters would have conveyed, which is that he is absolutely instrumental, not just in the medical well-being of his immediate family and currently comfort his parents and his brother-in-law, but his friend, Vincent Condina, I think you read a letter from Mr. Condina. Unfortunately, Mr. Condina passed just recently and was unable to be here.

Eddie doesn't just help medically, he helps with the schools. He helps with the kids' educationally. He helps getting them to and from soccer and baseball and basketball and all of these other tasks, because quite frankly it's not just him and his wife, Allyson. They have a five-year old, Tyler, who doesn't know about this, because Mr. Ting didn't know how to explain to a five-year old about this. But there are five other children that live in that house, being taken care of solely by Mr. Ting and his wife and Ms. Ting's siblings. They

are here, they do come to the house and they help, but they have working schedules in Atlantic City. They're not there on a regular basis. He and Allyson have taken on a monumental responsibility. I think by all the accounts of the letters they are doing a fantastic job. It's not easy. It's a true challenge. He deals with them with their schooling. He deals with taking care of them. They rely upon him.

As you may have realized from reading the letters, that some of them are translated from Vietnamese into English. With the exception of Eddie, his wife and her siblings, English is a second language. They can converse, but they are not fully communicative. That, while it always presents challenges, is mostly a challenge when trying to navigate the difficult orders of medical care and medical insurance. Mr. Ting, thus far, has been able to get his brother-in-law in with an excellent cancer specialist, buts the insurance company, in their infinite wisdom, is still denying coverage and he it trying to navigate those orders for his brother-in-law. He told me he worked it out. Last week it wasn't worked out, but apparently they made progress. This is what he spends his time doing, Judge, trying to help others. I don't want to say others that can't help themselves, because of course, they are adults, they can help themselves. But their ability to do so is much more hampered, and will be so, if Mr. Ting is absent from their lives.

You know about his father who has now, since the reparation of the PSR, his father was admitted to New York Methodist Hospital. He is in what they call the final stages of dementia. A prognosis, they can't give, and Eddie goes there daily, travels from Jersey to see him. With dementia, it's very difficult because you can imagine there are difficult times and there are sometimes moments of clarity. But as he is learning, those are growing fewer and further between. We don't know how much longer his father will be with us.

His mother has suffered from schizophrenia. He was, recently admitted to today Lutheran Hospital, and he was doing double duty going from Lutheran to his father and back and forth. Now she is home, but his father is in the hospital. As he said to me, he said, Look, I'm telling you, you can't even believe -- it's true because of everything that's happening all at once to me. But it is happening and Eddie says, All I can do is get up everything day and do the best I can to make it better for everybody else. That's what he tries to do, Judge. He messed up. He shouldn't have charged the rake. I already explained to you how it came about. But now the question is where to go from here.

Before I conclude, I want to draw reference to Allyson. Where is she? That's his wife in the front row, Judge. I'm sorry, Allyson, I have to explain this to the Court. Twice in the last six weeks Allyson, who has been

suffering from anxiety as a result of not knowing what's going to happen, Allyson, this past weekend fainted for the second time in the bathroom, slammed her face on the ground, cut her chin open. Eddie had to call 911. They had to rush her to the emergency room. They had to stitch her up. She is currently seeing a battery of different doctors to try and see what they could do to get to the bottom of it, but as of this moment there is no solid information on what it is, but everybody seems to lean towards the anxiety and the fear of Eddie being absent from the house.

This is a man who, when he was first arrested, Judge, wasn't permitted to gamble as part of his bail conditions. With the government's consent, you kindly agreed to allow him to gamble. He did so and when he did so, it's been much more limited, because with this case hanging over his head, he didn't feel like he had the mindset to gamble, because he does it as a profession, not as an addiction. He religiously reported all of that to his pretrial services officer Steinmer. Every day I would get the e-mails cc'd to me, any time he gambled, what he started, how he ended. Went by your rules to a "T." He honored his promise to the Court.

I say to the Court, he will honor his promise not to run afoul of the law again. Whatever conditions you put on him, he will honor. I said it in my sentencing submission and I reiterate it here now, that giving Eddie home confinement, if

possible, would enable him to continue to care for everybody that needs him. That's no easy task. Could also attach community service to an individual who enjoys helping people. He won't just do it because it's ordered. He will do it because he enjoys it, and he welcomes it. He will take the penance, but he wants to be able to contribute and not just rot away being warehoused. It is punishment to be told when you have to be somewhere and to do it and not get paid, but he will do it. Give him 100 hours, 200 hours, 500 hours of community service. The key is what Eddie asks me to ask you is to understand that he is not a bad person, but he did a bad thing. I add that he is a good person that did a bad thing. With all of the people that have stepped forward about him, not giving boilerplate statements that he is just a good guy. It's anecdote after anecdote of everything that this man does for people without any expectation of reward or benefit to himself, I think that that militates in favor of leniency.

Your Honor, with regard to the forfeiture, he has agreed to pay the $2 million forfeiture. I don't accept and Mr. Ting didn't accept that the 2 million represents profits. But it's proceeds. It doesn't matter if he profited or not. I explained to him under the law, that's how it works. He just doesn't want you to have this misguided belief that he profited so much because of inordinate expenses that went along with it.

Because the forfeiture is so high, originally

probation didn't take a position, but now they said no fine because he otherwise wouldn't be able to pay it. If you need me to speak further on that, I will not.

I think I have made all the points I want to make, just give me one second.

THE COURT: Can I ask you one factual question while you are looking?

MR. FRANZ: Absolutely.

THE COURT: In the government's submission, there was an indication that you referenced whether Mr. Ting recruited whales or the like, but there was an indication that he backed or staked, I think were the phrases that the government used, certain players in these games which is to say, as I understand it, that he received a portion of their winnings if they were to win.

Do you agree with that? If so, did that predate the taking of a rake from the game? Was it simultaneous with it?

MR. FRANZ: I think they are divorced from one another in my understanding. I will check with my client. There are times when somebody could be playing in a game and that could be in Vegas. I was out in Vegas investigating this a little bit. I watched to see what happens. The reason Vegas does so well -- this is my gambling for idiots lesson, because Vegas has so much money and the odds are slightly in its favor, they can eventually hold on and ultimately the casinos in Vegas are

more profitable. Players will pool money which means they are staked in another one. If I was going to play, and I only had $50,000 to play, but I run out, I'm done, people stayed by putting money in, so you share in the profits and you share in the losses as well. Because you are basically agreeing you play for us, because then you, at least, are a little bit deeper into your bench, so to speak, of money to keep playing because you are playing for the run.

Does that make sense, Judge?

THE COURT: I think so.

Do you know what period of time that sort of conduct took place? To put it differently, to the extent that you described this as a friendly game that a rake sort of emerged because Mr. Ting agreed to guarantee certain winnings or losses, did that conduct predate that change, that transformation in the game or is it something that came about at the same time?

MR. FRANZ: Mr. Ting, he is more of an expert, would like to answer the question if you will hear from him.

THE COURT: That's up to you.

MR. FRANZ: That's fine.

Stand up.

THE DEFENDANT: In terms of staking people in the game, the one rule I always had in my game is I always frowned upon staking people because most of the people that played in

the game, we all became kind of like family. We were very close. Very, very close. But with that being said, did I ever stake somebody? Yes. When I would see someone that's not doing good and they go, Eddie, I'm not doing good, I have no more money to play, do you think you could give me a shot and put me in the game? A lot of times I put them in the game, not to make money, just to try to get them back on their feet. It had nothing to do with me making money. It had nothing about me trying to hustle these guys. I mean, basically everybody -- not everybody. The majority of the people that played in my game, they were almost like family. They do barbecues together, we go to games together, we talk about kids together.

THE COURT: Slow down, please.

THE DEFENDANT: In terms of staking, I never set up stakes as a business. I would stake someone as a favor if they were doing bad in life and they needed that extra push. They say, Eddie do you mind putting me in this game? It will help me out. It wasn't for me to make money. Did I do it a lot? I rarely did it because I did frown upon it.

In terms of taking a piece of someone, I frowned upon that as well. But if I knew someone's bankroll could not permit, they say, do you mean taking a piece of me here, because I can't lose this amount, my bankroll is only this amount, would you mind taking a piece? I will say sure. It wasn't to make money, because in the end, I felt that if I took

a piece of three, four, people, it would be almost like a zero sum game.

THE COURT: Thank you.

MR. FRANZ: I think, Judge, what I'm hearing is it's the opposite. He wasn't staking people, so to speak, because there was a sucker in the game that he was going to make money off of. It was more somebody saying, Can you help me out? If anything, they might have been the sucker in the game, but as we know, when people didn't pay, he paid for them.

Any other questions that you have, your Honor?

THE COURT: No. Did you want to wrap up?

MR. FRANZ: I think I said everything I need to say at this point. There is issues if you give a term of imprisonment, but I could wait until after your sentence to address them.

THE COURT: Mr. Ting, is there anything that you would like to say before I impose sentence?

THE DEFENDANT: I pretty much wrote a lot of this stuff down. It seems like Eric covered a lot of it. A lot of it will be repetitive. I don't know if you want me to speak regarding it. I don't really think it's necessary.

It just basically explains about, like, how originally when I first started this game, it was a home poker game that was nonrake. Eventually, it turned in to a rake game and that's what made it illegal. I never should have done it, but

with that being said, it was a friendly game. I never threatened anybody. I never used physical force. But I never should have done it. It was just dumb. Just dumb. I'm sorry for it. I will never do it again. That's it, your Honor.

I could say about my family. Do you have time?

THE COURT: Sir, you are welcome to make any statement you like before I impose sentence. If there is anything you would like to say, this is your chance to do so. You don't have to. It is up to you. I would just ask to please move your microphone in front of you so we can all hear you.

THE DEFENDANT: Basically, I'm one of four children. Growing up and to this day my mom, she suffers from schizophrenia. My dad was an engineer for the City of New York. He basically raised me and my three siblings. There was four of us and a sick mom. He had a middle-class income and he basically did an incredible job. He basically put us through school, gave us guidance. My dad was always a giver, not a taker. When my grandma got sick and old, he took her into the home and he basically took care of her until she passed away. Me and my dad we never really had that father-son relationship that you dream about, but he is the guy that I look up to. He is my inspiration. Right now, my dad is diagnosed with dementia, like Eric had mentioned. He has been diagnosed with dementia for the last 10 years. Just last week me and my siblings, we took him into New York Methodist Hospital because

he couldn't swallow and really move. The doctors diagnosed him with final stage dementia.

I just want to let you know, obviously you probably know, I mean taking care of sick elderly parents, it's a lot of work, and basically after seeing what I did, I know it's not worth it, because now I might not be there for my parents. I'm making my siblings suffer more because now they have to chip in more to help out. Changing his diapers, help him eat. I just want to let you know that there is nobody to blame, but myself. I never, never, should have started taking a rake.

In regards to my under family, I have been married close to six years. I have an amazing son, his name is Tyler, he is five-years old. He is a little stubborn, a little spoiled, but he is my pride and joy. He is a very fun kid, very happy, gets along with everybody. Me and him were basically attached by the hip. I always said to my wife and to my friends and to myself that I always want to teach Tyler to be like -- I always wanted to teach Tyler what my dad taught me, to always help people, be good to people, your Honor, basically never to judge people and always to be there for people.

In addition to Tyler, I am legal guardian, and me and my wife, to five additional children. My niece, Cindy, who is, four-and-a-half-years old, prior to moving in with us in Mahwah, she had speech development issues, I think it was a

combination of her parents both speaking Vietnamese and English. So it impeded her language. But in the last six months, she has made tremendous progress. Nevertheless, she is very playful and very adorable.

My other niece, Tee, who is eight-years old, prior to moving in with us, she didn't do too good in school. She was raised in Atlantic City. She didn't do too good in school. She was always negative and wasn't sociable. Now, I see her, she is very cheerful. She is doing better in school. She is interacting with other kids.

My nephew, Brian, who is eight-years old, he has become an honor student over at Betsy Ross School, which is by us in Mahwah. He basically challenges himself every day to try to do better in school. He has become an inspiration to the other kids, because the kids see that he is doing so well in school, that all the kids want to do well. They see Brian has 98, 99, 100. Prior to him moving in with us, he was obese. I'm getting him involved with sporting activities, physical activities, to help fight the obesity.

I have my other niece who is eight, and her name is Christine. She is just a total princess. Very respectful, soft-spoken, obedient. Just super terrific.

And my last nephew who is Andy, he is 15. Prior to moving in with us, he lived in Atlantic city and he was socially challenged, emotionally immature, slow with school,

and he was bullied in school. As he moved in with us, I see him doing better in school. He is not an A or B student, but you could definitely see him learning. He is getting involved with after-school programs where he is actually trying to make friends. He is not getting bullied.

The reason why I'm telling you all of this about my family is I see everything I do for my family and I realize they need me, but because of what I did, it's like I'm going to make them suffer. To me, I should have known this, but I guess whether it was a blackage in my brain or not, if I would have known this, no way would I have ever thought about taking a rake. I'm really sorry for what I did. I never should have done it. I will never break the law again, I will tell you that.

Thank you, your Honor.

MR. FRANZ: There was one thing that I forgot to say, a very minor point.

THE COURT: Okay.

MR. FRANZ: I'm sure it doesn't matter at this point.

In the government's letter they referenced a rather lengthy conversation on February 21, 2012. That conversation shifts topics to somebody that won $1.8 million and there was discussion back and forth. If you look at it carefully, this conversation has nothing to do with an Eddie Ting poker game. They were discussing what they had heard about a game that

occurred in LA that didn't belong to Eddie Ting. He wasn't a participant in the game. This is a conversation discussing somebody else's poker game. It has nothing to do with any illegal activity that has to do with this case here.

The last thing I will say to your Honor is one thing I neglected to say, and it dawned on me last night. From the moment I met him, because he just made me realize it with how he was speaking, he was shell-shocked of the enormity of the situation he found himself in being charged federally with federal crimes, and also at the time being associated with organized crime and things like that. That has now been distanced, but he is just shellshocked from it, and I think that his words aren't just words. I think that he is a man that recognizes that he will never run afoul of the law again, because he realizes how much he puts in jeopardy and the cost that accompanies it.

Thank you.

THE COURT: Thank you very much.

Mr. Naftalis, I usually give the defendant and defense counsel the final word, but there have been various factual representations made. I don't know if you have anything you want to say with respect to that. Otherwise, I'm happy to proceed with the remainder of the sentencing.

MR. NAFTALIS: Your Honor, we disagree, obviously, with the factual disputes. I don't know if it's worth getting

into, but I don't think there is a dispute that he ran a huge game. I think that the argument that he was taking a rake to cover expenses is like saying I was defrauding somebody, but I didn't get to keep all the money. So, therefore, you shouldn't look at the full dollar value. I think the fact that he guaranteed the game is what allowed him to be so successful.

He staked people because he could afford to lose money, because he was taking people and making money that way. These are not people who are stiffing each other that much. These are really wealthy people. When you take a few percentage points of a huge pot, you make a ton of money. The argument that he didn't profit is not the case. If you look at the checks in this case, they are huge, five digits, six digits, seven-digit checks.

THE COURT: Is there any reason sentence should not be imposed at this point?

MR. NAFTALIS: No, your Honor.

MR. FRANZ: No, your Honor.

THE COURT: In imposing sentence, I am required to consider the various factors set forth in Title 18 United States Code Section 3553(a). These include, first, the nature and circumstances of the offense, and history and characteristics of the defendant; second, the need for the sentence imposed to advance the purposes of sentencing; namely, to reflect the seriousness of the offense, to promote respect

for the law and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner; third, the kinds of sentences available; fourth, the guidelines range, which I have found to be 10 to 16 months' imprisonment; fifth, any pertinent policy statement; sixth, the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct; seven, the need to provide restitution to any victims of the offense.

Ultimately, I am required to impose a sentence that is sufficient, but no greater than necessary to comply with the purposes of sentencing that I mentioned a moment ago.

Now, I have given substantial thought and attention to the appropriate sentence in this case. I certainly read many, many letters in connection with preparing for sentencing. I will tell you that I don't find it a particularly easy sentence to impose or craft, because of what I see as sort of the contradictions inherent to the defendant and his conduct. On the one hand, I think a substantial and real sentence is warranted by virtue of the fact, most notably the fact that this was not Mr. Ting's first offense, that he was previously arrested and convicted for precisely or pretty much precisely

the same conduct.

While I take you at your word, Mr. Franz, that he was not the organizer of that particular game, the fact of the matter is that he knew full well and firsthand what could happen if you engaged in the kind of conduct that he engaged in here, and the fact that he was previously convicted did not deter him from doing so. I think that is significant and a significant factor in determining an appropriate sentence.

Separate and apart from that, I think a real sentence is warranted by virtue of the fact that this is conduct that lasted over some period of time, at a minimum from 2010 until 2013. Certainly the defendant has not disputed the government's representation or description of his game as perhaps the largest and highest stakes illegal poker game in all of New York City, which I would imagine may make it among the highest in the country, for that matter. Or the fact that he made a significant profit, even if the precise amount of that profit is unclear or somewhat in dispute, and perhaps somewhat reduced by covering losses of others and the like.

In addition, as the government points out, Mr. Ting has received an enhancement as a leader or organizer or manager of the conduct, which distinguishes him from other defendants in this case, and defendants generally. At the end of the day, I am somewhat skeptical about the explanation for why Mr. Ting took the rake. That is to say that it was sort of this

selfless act that the defense has tried to describe it. I'm not sure it ultimately matters whether that is factually true or not in the sense that I agree with Mr. Naftalis that the bottom line is taking the rake or covering the losses of those who participated was clearly a business decision in many respect and an essential part of the game continuing and being such a high-stakes game.

I think for all of those reasons something more than a slap on the wrist, or even something more substantial than that would be warranted.

Now, if that were all there was, then I might well agree with the government that a sentence of imprisonment within the 10-to-16-month range would be appropriate, but I do think that there are some substantial mitigating factors here that the defense has emphasized. I think based on the letters that I have read and what I have seen, that I don't question that Mr. Ting is somebody who is, as Mr. Franz put it, actually cares about people. From the conduct that he and his wife have engaged in with respect to his family and his nieces and nephews, that is a commitment to his family that goes beyond simply providing money. From that, from his care to his parents, I mean all of which one would hope someone would do for members of their own family, but not everybody does and not everybody does it in a manner that requires as much out of them as Mr. Ting appears to have given here.

Not to mention that generosity, if you will, seems to go beyond just family, as his role and conduct with respect to Mr. Condina -- I'm sorry to hear about his death -- as that seems to subject suggest.

I recognize that a real sentence does and will impose costs on all of those people, that is to say, on Mr. Ting's family. That is another factor that I think militates in favor of some mitigation, but at the same time, as Mr. Ting himself has recognized, the blame for that lies not with the law or with the Court, but with his decision to have done what he did. Notwithstanding that, which is to say that as much as he may be a consummate father -- and I don't know if he is or not -- the fact of the matter is he really did gamble with their well-being as much as anything else. That is a price that he will have to pay and accept that he had to pay.

All of which leads me to think that the recommendation made by probation is a reasonable and middle-ground sentence to impose here between the sentence that the government has sought and the sentence that the defendant has asked for that would involve more incarceration whatsoever.

Having said that, I will now impose sentence. Mr. Ting, would you please rise.

Mr. Ting, the Court hereby sentences you to a period of five months' imprisonment followed by two years of supervised release with a special condition of five months of

home detention with location monitoring.

During your term of supervised release, you will be subject to the following mandatory conditions: You shall not commit another federal, state or local crime. You shall not illegally possess a controlled substance. You shall not possess a firearm or a destructive device. You shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter as determined by probation. You shall cooperate in the collection of DNA as directed by probation.

In addition, the standard conditions of supervised release shall apply. You must also meet the follow special conditions: You shall comply with the conditions of location monitoring for a period of five months, which program may include electronic monitoring or voice identification. During that time, you will remain at your place of residence, except for employment and other activities as approved by your probation officer. You will maintain a telephone at your place of residence without call forwarding, a modem, caller ID or call waiting for the above period. Portable cordless telephones are not permitted. Location monitoring shall commence on a date to be determined by the probation officer. You shall pay the cost of location monitoring on a self-payment or copayment basis as directed by the probation officer. You

shall provide the probation officer with access to any requested financial information. If you have not satisfied your forfeiture obligations or special assessment, you shall not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless you have satisfied your forfeiture obligations and special assessment. You are to report to the nearest probation office within 72 hours of your release from custody and you shall be supervised in the district of your residence.

I am not going to impose a fine because factoring in the forfeiture order, I find that you do not have the ability to pay a fine. Restitution is not at issue. I will impose the mandatory special assessment of $100, which shall be due and payable immediately. As reflected in the forfeiture order and I believe one was previously entered, I find that you are to forfeit to the United States $2 million, which represents the proceeds you obtained, directly or indirectly, as a result of your criminal activity. That obligation shall be joint and several with that of your codefendants.

Does either counsel know of any legal reason why this sentence shall not be imposed as stated?

MR. NAFTALIS: No, your Honor.

THE COURT: Mr. Franz.

MR. FRANZ: No, your Honor.

THE COURT: Sentence as stated is imposed. I find

that that sentence is sufficient, but no greater than necessary to satisfy the sentencing purposes set forth in Section 3553(a)(2), including the need to promote respect for the law, to provide just punishment for the offense, to afford adequate deference to this defendant and to others, and to protect the public from further crimes of the defendant.

Mr. Ting, I imagine that you may be disappointed. I understand that you wanted to leave this room without any sentence of incarceration imposed. It is my judgment, based in part of the fact that this is not your first brush with the law for this sort of conduct, based on the scope, length and scale of the conduct at issue, that that would not have been an appropriate sentence, and that for you and for others who might engage in this, a period of incarceration is necessary.

I hope you understand that when you were gambling, that you were gambling, not only with money, but with your family's well-being. In that regard, you lost. I hope that your sentence and your conviction does make you rethink how you have led your life over the last few years, and as you stated, as Mr. Franz stated, that you are now, as Mr. Franz put it, done with it. That you will not engage in this sort of thing, and if you stick with gambling at all, that you make sure that you scrupulously obey the line between legal and illegal gambling and you do not end up back in front of me or in front of any other judge for that matter.

I can assure you if you end up back in front of me during your term of supervised release that you will regret that, and I do not want to be put to that decision.

Mr. Naftalis, do you have any objection to the defendant being allowed to voluntarily surrender for his term of incarceration?

MR. NAFTALIS: No, your Honor.

MR. FRANZ: I want to ask for 60 days and a recommendation, although we know it's not binding on the Bureau of Prisons that he receive Fort Dix, which is in New Jersey. In the event that we don't get a designation within one week of whichever date you set, could I apply to the Court to postpone surrender so he doesn't have to surrender to the MCC while we await a designation?

THE COURT: Let me start by saying I think voluntary surrender is certainly appropriate here, not only because of the defendant's compliance with his conditions thus far, but also it will give him an opportunity to make the necessary arrangements to ensure that his family is cared for in his absence.

I will give you until March 21, two months from today to surrender. My understanding is that the designation should probably happen within a period of about six weeks. I think that is more than enough time for the designation to be made. I will order that the defendant surrender for service at the

institution designated by the Bureau of Prisons before 2:00 p.m. on March 21, or as notified by the probation or pretrial services department. I will say that if you do not receive notice of the designated facility and I do not extend the deadline in the event that there is an application, then you must surrender to the MCC to the Metropolitan Correctional Center by 2:00 p.m. on that same date.

Mr. Franz, if by chance there has not been a designation made by the week before, you are certainly welcome to make an application. In all likelihood, I would grant it to extend the date to ensure that he could surrender directly to the institution.

Recommending an institution, Fort Dix is what you had asked for?

MR. FRANZ: That's correct, your Honor, because he lives in New Jersey.

THE COURT: I understand. I will recommend, if possible -- obviously that decision is not mine to make, but the defendant be designated to Fort Dix. If that is not possible, certainly somewhere as close to Mahwah, New Jersey, to facilitate maintenance and ties to his family.

Mr. Ting, your conditions of release will continue up until the time that you report to begin your sentence. If you fail to report to begin your sentence, you may be charged with another criminal offense.

Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Mr. Naftalis, I think there is at least one other count that must be dismissed at this time.

MR. NAFTALIS: Yes, we move to dismiss that count.

MR. FRANZ: It's actually Counts 12 and 22.

MR. NAFTALIS: We move to dismiss all underlying counts.

THE COURT: We will dismiss all others counts involving Mr. Ting, which I take it are Counts 12 and 22 on the government's motion.

Mr. Ting, to the extent that you have not to given up your right to appeal your conviction and sentence through your plea of guilty in the agreement that you entered into with the government, in connection with that plea, you have the right to appeal. If you are unable to pay the cost of an appeal, you may apply for leave to appeal in forma pauperis. A notice of appeal must be filed within 14 days of the judgment of conviction.

Anything further, Mr. Naftalis?

MR. NAFTALIS: No, your Honor. Thank you.

THE COURT: Mr. Franz.

MR. FRANZ: Nothing, your Honor. Thank you.

THE COURT: In that case, I wish everybody a safe trip home. Good luck, Mr. Ting. We are adjourned. Thank you.

(Adjourned)