

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 26, 2014

BY ECF

The Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square, Room 2202
New York, New York  10007

>    Re:    United States v. Dmitry Druzhinsky
>           1:13 Cr. 268 (JMF)

Dear Judge Furman:

      The Government respectfully writes in advance of the defendant's sentencing, currently scheduled for March 31, 2014.

### The Offense Conduct and Relevant Conduct

      Druzhinsky operated an illegal gambling business that utilized, primarily, online gambling accounts at websites like pinnaclesports.com, to accept bets from clients in the United States and in the former Soviet Union on sporting events.  (PSR ¶ 87.).  Co-defendant Hillel Nahmad placed bets for tens of thousands of dollars directly with Druzhinsky.   (PSR ¶ 87.). Druzhinsky frequently interacted with other operators of illegal gambling businesses, including co-defendant Alexander Zaverukha.  (PSR ¶ 87.).  Druzhinsky and Zaverukha discussed managing their online gambling accounts to protect against gambling professionals gaining access to them, and thereby causing Druzhinsky and Zaveruka to lose money.  (PSR ¶ 87.).  For example:

- In a call between Druzhinsky and Zaverukha on December 13, 2012, Zaverukha said that his number is "653,988" and Druzhinsky said his number was "653,989."  They were comparing their calculations – which were off by one dollar – for their gambling business.  Zaverukha said that Druzhinsky is due "$75,300," which represented Druzhinsky's share of the gambling business proceeds.  During the call, Druzhinsky stated that another individual ("Customer-1") called Druzhinsky, and that Druzhinsky told Customer-1 that if Customer-1 wants several accounts open, Druzhinsky can do that, but the amounts of Customer-1's bets will be limited.  Zaverukha instructed Druzhinsky to tell Customer-1 that that they know the difference between so-called normal street bets and professional ones coming from America, and it is not beneficial to Druzhinsky to

Case 1:13-cr-00268-JMF     Document 765     Filed 03/26/14     Page 2 of 6

Page 2

have six professional bets out of ten. Zaverukha believes that Customer-1 uses insider's information, and has to be told that Customer-1 will be cut off if Customer-1 keeps placing 'professional' bets.

- In another call between Druzhinsky and Zaverukha on December 13, 2012, Druzhinsky and Zaverukha discussed setting up Customer-1 with accounts so that Customer-1 could bet with their sports book. They discuss that Druzhinsky is leaving one account for the college games for Customer-1. There will be about 15 there. Customer-1 is also asking him for a second account also, where he promises not to duplicate bets. Zaverukha and Druzhinsky agree to compare the bets at the end of the day and see if Customer-1 kept his word – otherwise, they'll close down the second account.

- In a call between Druzhinsky and Zaverukha on December 17, 2012, Druzhinsky and Zaverukha talk about transferring $100,000 in credit in exchange for cash. Druzhinsky asks Zaverukha if he needs to transfer anything to Pinnacle because someone wants to give him $100,000 in cash to put there. Druzhinsky says he is not sure if there is anything now. Zaveruka says that there is up to $100,000 available, and Zaverukha can take something from [another customer]. In addition, during this call, Druzhinsky and Zaverukha also talk about how to manage bets being placed on NBA games through their sports book by placing limits. Specifically, Druzhinsky asks if Zaverukha placed limits on the NBA games, and Zaverukha replies that he did not. Zaverukha says he will get back to Druzhinsky about Pinnacle in a few hours.

Druzhinsky also conspired with Anatoly Shteyngrob and Ilya Rozenfeld to launder proceeds of the illegal gambling business from Europe into the United States. (PSR ¶ 88.). Specifically, certain gambling proceeds were sent from overseas to a bank account in the name of a car repair shop owned by Shteyngrob and disguised as car repair payments. (PSR ¶ 88.). Those monies were then sent to various accounts controlled by Druzhinsky and Shteyngrob in the names of various automobile ventures they jointly operated, and again disguised as payments related to automobile transactions. (PSR ¶ 88.). From there the money was distributed to Druzhinsky and, to a lesser extent, Rozenfeld. For example:

- In a call between Druzhinsky and Rozenfeld on May 26, 2012, Rozenfeld indicated that he was concerned that they will throw them out of Chase too because money keeps coming on their accounts. Rozenfeld says they have to be careful, and that he already got a call from the bank asking who "Titan" is. They are sending money from some offshore companies. Rozenfeld asks Druzhinsky to make sure they are not sending money from Latvia and other places. Druzhinsky asks Rozenfeld to see where Titan is sending money from. Rozenfeld said he would look and call Druzhinsky back.

During this call, Rozenfeld is concerned that the banks have detected a fraud in Titan Industries. Titan Industries is an account in Latvia that is used by a high-end gambling client ("Customer-2") who runs his own sports book and sends gambling money from Titan Industries to the United States for Druzhinsky to CarsfromUSA.com, which is located in Brooklyn along with seven other companies at the same location. Prior to the time of this call in May 2012, roughly $1.5 million was sent from Titan Industries to CarsfromUSA.com or other companies

owned by Druzhinsky or Rozenfeld.  Although the wires were justified as being for car parts or spare parts, there was no evidence that Customer-2 purchased any cars from CarsfromUSA.com.  Significantly, after May 2012, wire transfers were made from Titan to AC Delco (Anatoly Shteyngrob's company), then to companies owned by Druzhinsky and Rozenfeld.  Between 2008 and 2013, over $4 million was laundered through Druzhinsky's companies, mainly CarsfromUSA.com.

- In a call between Druzhinsky and Shteyngrob on May 29, 2012, Druzhinsky says he is to receive money from Latvia and is afraid that the transfer will not go through because the U.S. banks do not trust Latvian financial institutions.  Druzhinsky asks Shteyngrob if it makes sense to send money through Austria.  Shteyngrob says he cannot do that.  Druzhinsky will have to do it himself.  Druzhinsky asks if he will be able to send the money where they used to send it to, to Customer-2.  Shteyngrob says Druzhinsky cannot do that, and that Shteyngrob will have to think about it.  Druzhinsky then says he can pay in cash in Kiev and asks if it's better.  Shteyngrob says it's definitely better to pay the person in cash, and Druzhinsky says that's what he will do.

- In a call between Druzhinsky and Shteyngrob on May 30, 2012, Druzhinsky asks if Shteyngrob got the money.  Shteyngrob replies, "yes.  There is exactly 200,000."  Druzhinsky asks if Shteyngrob is sure there won't be any problems with the bank.  Shteyngrob told Druzhinsky before not to send out exactly 200.  Druzhinsky told the guy to send 205, but the jerk probably forgot.  Druzhinsky wants the money to stay there for a couple of days.  Shteyngrob said Druzhinsky can take it because Shteyngrob wrote the check to the father.  Druzhinsky will get it then.  Shteyngrob said he was charged 15.  Druzhinsky said Shteyngrob can charge Druzhinsky 20.

During these calls, Druzhinskly and Shteyngrob were upset that a wire transfer of $200,000 from Titan to AC Delco happened because the round numbers raise red flags in the money laundering departments at the banks.  They discuss that the transfer should not have been for an amount in a round number.  Druzhinsky wanted to leave the money in the account for a couple of days and then transfer the money.  A Chase bank account statement for AC Delco Ukraine shows that on May 30, 2012, there was a $200,000 wire transfer from Titan Industries to AC Delco Ukraine with a reference to auto parts.  That same day, there were other checks from AC Delco to companies run by Rozenfeld and Druzhinsky.

Druzhinsky also conspired with Golubchik to launder gambling money through Ocean Avenue Development, a real estate venture that they operate together in Brooklyn, to a shell company in Cyprus.  (PSR ¶ 88.).  For example:

- In a call between Druzhinsky and Anatoly Golubchik on May 23, 2012, the following exchange took place:

    Druzhinsky:   I got your email.  Are you sure you want me to send it to that country?

    Golubchik:    Why not?

| | |
|---|---|
| Druzhinsky: | Why not?  First this money is more or less kosher.  I don't understand why it has to go there.  Secondly, don't you have a U.S. corporation?  Because they don't like it that much at the bank when you do repeats of crap.  Is it important for you? |
| Golubchik: | No, I mean, eh, the original investment that came from there. . . if do not cover. . . |
| Druzhinsky: | The original investment came from that company, right? |
| Golubchik: | Well, it came from a different one.  But it doesn't matter.  It pretty much came from the same place. |
| Druzhinsky: | Well, look.  I can send it there in theory, but I just [unintelligible]. |
| Golubchik: | So what are your concerns in this respect?  Let me call you back in five minutes. |

During this call, Druzhinsky is asking Golubchik if he wanted to send $168,350 in profits that they have to Cyprus, specifically to Northside Capital, a shell company that Golubchik and Vadim Trincher used to launder gambling proceeds.  We know that because just two days after this call, on May 25, 2012, $168,350 was transferred from Ocean Avenue Development to Northside Capital.

On April 16, 2013, FBI Special Agents, wearing clearly identified law enforcement jackets and vests, arrested Druzhinsky at his residence in Brooklyn (the "Residence").  There are multiple exterior video cameras located around the Residence.  While FBI agents knocked on the front door of the Residence, one FBI agent ("Agent-1") observed Druzhinsky move around the interior of the Residence and go to a laptop computer (the "Computer") and cellphone (the "Cellphone") on the kitchen table.  Agent-1 observed through the rear windows and door of Residence that Druzhinsky appeared to be doing something on the Computer.  Agent-1 yelled at Druzhinsky to open the door, which Druzhinsky then did.  Once inside the Residence, Agent-1 observed that the Computer – which Druzhinsky had been using – was now locked.  Agent-1 also observed the Cellphone next to the Computer, as well as a box of gambling chips on the chair in front of the Computer.  Also, there are multiple video screens throughout the Residence showing footage from the exterior video cameras of the Residence.

### The Plea and Applicable Guidelines Range

On October 4, 2013, the defendant pled guilty, pursuant to a plea agreement, to Count Seventeen of the Indictment which charged him with operating an illegal bookmaking business that utilized gambling websites operating illegally in the United States, in violation of Title 31, United States Code, Sections 5363 and 5366.  (PSR ¶ 64.).

The Probation Department calculates a Guidelines range of six to twelve months' imprisonment. (PSR ¶ 145.). The Government agrees with the Probation Department's Guidelines calculation.

### The Appropriate Sentence

Under the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that a sentence within the Guidelines range of six to twelve months' imprisonment is appropriate to reflect the serious nature of the offense. Druzhinsky operated an illegal gambling business that accepted bets for significant amounts of money from clients in the United States and the former Soviet Union. Druzhinsky's operation of his business was sophisticated – he worked with others to protect against accepting professional bets from which he would lose money.

In addition, the defendant's money laundering activities constitute relevant conduct. Druzhinsky's money laundering activities were sophisticated, as he conspired with others to launder the proceeds of his illegal gambling business from Europe into the United States, and disguise the proceeds as payments related to automobile transactions through the use of automobile ventures. Between 2008 and 2013, over $4 million was laundered through Druzhinsky's companies, mainly CarsfromUSA. Druzhinsky also used his other companies, such as Ocean Avenue Development, Sunrise Holdings, Ivana Holdings and Brooklyn Tennis Club, in laundering the illegal gambling proceeds. The defendant's money laundering activities were significant to both facilitating and perpetuating his illegal gambling business.

Given the significant nature and scope of Druzhinsky's illegal gambling business and money laundering activities, Druzhinsky is more culpable then the other gambling defendants sentenced to date, and a Guidelines sentence is justified for his criminal conduct. Furthermore, Druzhinsky's Guidelines range would be much higher if the Sentencing Guidelines accounted for the amount of money involved in his illegal gambling business, which they do not. The defendant had the opportunity to use his companies for legitimate employment only, but instead, chose to use them in furtherance of his criminal activities. A Guidelines sentence would therefore deter others from making the same bad decision as the defendant's. Under the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that a sentence within the Guidelines range of six to twelve months' incarceration is appropriate given the nature and

Case 1:13-cr-00268-JMF    Document 765    Filed 03/26/14    Page 6 of 6

Page 6

circumstances of the offense and the need for the sentence to promote respect for the law and deter further criminal conduct.

>   Respectfully submitted,
>
>   PREET BHARARA
>   United States Attorney
>
> By:     /s
>   Kristy J. Greenberg
>   Harris M. Fischman
>   Peter Skinner
>   Joshua A. Naftalis
>   Assistant United States Attorneys
>   (212) 637-2469 / 2305/ 2601 / 2310

cc:     Edward V. Sapone, Esq. (By ECF)